EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* AMÉRSITO MARTÍNEZ VEGA, acusado y apelante.

Número: CR-69-103 Resuelto: 9 de abril de 1970

*P. Pagán Colón,* abogado del apelante; *Gilberto Gierbolini, Procurador General,* y *Américo Serra, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

Al filo de las doce de la noche del día 31 de diciembre de 1966, el apelante hizo varios disparos de revólver desde el balcón del apartamiento que ocupaba en uno de los edificios del Caserío Manuel A. Pérez de Río Piedras, hiriendo con

uno de los proyectiles al ser humano Yolanda Maldonado, a consecuencia de cuya herida murió.

Por estos hechos el apelante fue acusado de los delitos de homicidio involuntario e infracción al Art. 6 de la Ley de Armas de Puerto Rico.

El día 3 de noviembre de 1967 comenzó a celebrarse la vista de ambos casos conjuntamente ante el Juez Superior, Hon. Guillermo A. Gil Rivera. Mientras desfilaba la prueba de cargo el tribunal decretó un *mistrial*, disolvió el jurado y ordenó que se celebrara el juicio en el caso por homicidio involuntario ante otro jurado y otro juez. El tribunal continuó celebrando la vista en el caso por infracción a la Ley de Armas y luego de desfilar la prueba de ambas partes, declaró culpable al acusado de ese delito.

El 29 de diciembre de 1967 se celebró el juicio en el caso por homicidio involuntario presidido dicho juicio por otro magistrado. El jurado que intervino declaró al acusado culpable del delito imputádole. En 19 de febrero de 1968 se dictó contra el acusado una sentencia suspendida de 3 años de cárcel por el delito de homicidio involuntario. El mismo día el Hon. Juez Gil Rivera le sentenció a cumplir un año de cárcel por la infracción a la Ley de Armas. Aunque lo solicitó, se le negó la suspensión de los efectos de esta sentencia.

En este recurso el apelante señala la comisión de varios errores. En el primero sostiene que tenía derecho a la celebración de una vista preliminar a tenor con la Regla 23 de Procedimiento Criminal en el caso por homicidio involuntario.

▮ No tiene razón. La Regla 23 de Procedimiento Criminal dispone la celebración de una vista preliminar "en todo caso en que se imputare a una persona un delito grave (*felony*)." Esta regla conserva la distinción general hecha en el Código Penal (33 L.P.R.A. sec. 35) entre delito grave

y delito menos grave. (¹) Delito grave es un crimen castigado con la pena de presidio. (²) El delito de homicidio involuntario es un delito menos grave (*misdemeanor*) porque se castiga con multa o cárcel o ambas penas (³) aunque por disposición expresa del Art. 204 del Código Penal (33 L.P.R.A. sec. 636) y el párrafo 2 de la Sec. 11 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, el acusado de dicho delito tiene derecho a juicio por jurado. *Pueblo* v. *Matías Castro*, 90 D.P.R. 528 (1964). La frase "delito grave (*felony*)" usada en la Regla 23 se refiere a los delitos clasificados como tales por el Código Penal. Por lo tanto, no está incluida en ella el delito de homicidio involuntario que es un delito menos grave (*misdemeanor*). *Dávila Vives* v. *Tribunal Superior*, 93 D.P.R. 776 (1966).

Se señala como segundo error la negativa del tribunal sentenciador a desestimar las acusaciones tanto el día 12 de septiembre como el 3 de noviembre de 1967, ya que el acusado no había sido sometido a juicio dentro de los 122 días siguientes a la presentación de las denuncias, sin existir justa causa para ello ni haber el acusado consentido a la demora.

Las acusaciones se radicaron el día 24 de enero de 1967. El acto de su lectura se celebró el 9 de febrero siguiente y en esa misma fecha se señaló el 4 de abril de 1967 para la celebración del juicio. En el ínterin el acusado radicó una moción de desestimación fundada en la Regla 64 (p) de las de Procedimiento Criminal, la cual fue discutida y resuelta en su contra el día 13 de marzo de 1967 y se ratificó el señalamiento del caso hecho para el 4 de abril. En esta fecha el

---

(¹) Esta distinción se sigue en otras de las Reglas de Procedimiento Criminal. Véanse, por ejemplo, las Reglas 22, 64, 69, 111, 162, 166, 174, 243. Véase, además, *Pueblo* v. *Tribunal Superior*, 95 D.P.R. 580 (1967).

(²) Véase *Pueblo* v. *Méndez*, 65 D.P.R. 702 (1946), donde se resuelve que cuando la Legislatura califica un delito de menos grave aunque apareje pena de presidio, el delito es menos grave y que en ese caso especial no se aplica la distinción general entre uno y otro delito.

(³) *Pueblo* v. *Tribunal de Distrito*, 66 D.P.R. 399 (1946).

acusado solicitó la suspensión de la vista de los casos hasta tanto este Tribunal resolviera una solicitud de *certiorari* que había presentado para revisar la resolución denegatoria de su moción de desestimación. El tribunal a quo accedió a la suspensión e hizo un nuevo señalamiento para el 20 de junio de 1967. En 26 de abril de 1967 dimos un no ha lugar a dicha solicitud de *certiorari* y el mandato fue recibido en el tribunal de instancia el día 12 de mayo de 1967.

En 20 de junio de 1967, el tribunal suspendió la vista de los casos por ausencia de dos testigos de cargo, uno de los cuales se encontraba en los Estados Unidos. Se hizo un nuevo señalamiento para el 21 de julio de 1967 y se ordenó el arresto de una testigo que no había comparecido el 20 de junio.

En 30 de junio de 1967 el acusado radicó una moción para desestimar la acusación por no haberse celebrado el juicio dentro de los 120 días de radicada la acusación. Esta moción se señaló para el 21 de julio de 1967, fecha señalada para el juicio. En dicho día el acusado desistió de su moción para desestimar ya que tres días antes había solicitado se dejara sin efecto dicha moción porque aún no habían transcurrido los 120 días. Alegó estar preparado para el juicio pero el tribunal lo suspendió debido a que se encontraba viendo otro caso de homicidio involuntario. Ordenó que se citara a tres testigos de cargo que no habían comparecido e hizo un nuevo señalamiento para el día 12 de septiembre de 1967.

El 8 de septiembre volvió el acusado a solicitar la desestimación de las acusaciones por no haberse celebrado el juicio dentro de los 120 días de radicadas las acusaciones. Esta moción se discutió y fue declarada sin lugar el día 12 de septiembre, fecha señalada para el juicio. Con la objeción de la defensa el tribunal suspendió la vista de los casos debido a que iba a estar ocupado durante todo ese día en la vista de otro caso por Asesinato en Primer Grado. Se señaló nuevamente el juicio para el día 3 de noviembre de 1967. En esta fecha el acusado volvió a solicitar la desestimación de las

acusaciones. El tribunal la declaró sin lugar por entender que hubo justa causa para la demora y por el fundamento adicional de que el acusado había renunciado implícitamente a su derecho a un juicio rápido al no solicitar que se adelantara el señalamiento para una fecha dentro de los 120 días. Acto seguido se procedió a la celebración del juicio. [4]

La incomparecencia de dos testigos de cargo el día 20 de junio de 1967, fecha señalada para el juicio, uno de los cuales se encontraba en los Estados Unidos y cuyo arresto fue ordenado por el tribunal, era causa justificada para decretar la suspensión del juicio. *Pueblo* v. *Cruz Rivera*, 88 D.P.R. 332 (1963); *Pueblo* v. *Pacheco Ruiz*, 87 D.P.R. 680 (1963); *Pueblo* v. *Pérez Suárez*, 83 D.P.R. 371 (1961); *Montalvo* v. *Corte*, 59 D.P.R. 545 (1941); *Pueblo* v. *Irlanda*, 45 D.P.R. 586 (1933); *Pueblo* v. *Ibern*, 31 D.P.R. 917 (1922).

Los dos señalamientos posteriores hechos para el 21 de julio y 12 de septiembre de 1967 estaban dentro del término legal de 120 días a partir de la suspensión decretada por justa causa. *Pueblo* v. *Ortiz*, 62 D.P.R. 298 (1943); *Pueblo* v. *Rexach*, 62 D.P.R. 22 (1943); *Pueblo* v. *Irlanda*, supra y *Pueblo* v. *Ibern*, supra.

Aceptado que el hecho de que el tribunal estuviera ocupado los días 21 de julio y 12 de septiembre de 1967, viendo otros casos, no es causa justificada para las suspensiones decretadas en dichas fechas, [5] entonces el señalamiento hecho para el 3 de noviembre de 1967, fecha en que se celebró el juicio, caería fuera de los 120 días. Este señalamiento se hizo el día 12 de septiembre de 1967. Si bien el

---

[4] Con motivo de un accidente ocurrido durante el proceso, el tribunal, a solicitud de la defensa y con el allanamiento del fiscal, disolvió el jurado que entendía en el caso de homicidio involuntario y ordenó que el juicio se celebrara ante otro jurado. En cuanto a los procedimientos posteriores, no se ha planteado cuestión alguna respecto al derecho del acusado a un juicio rápido.

[5] Véase *Jiménez Román* v. *Tribunal Superior*, 98 D.P.R. 874 (1970), resuelto en 19 de marzo de 1970.

acusado se opuso a la suspensión decretada, no objetó el nuevo señalamiento, ni hizo solicitud alguna para que se adelantara dicho señalamiento. Para la fecha en que se hizo ese señalamiento aún no habían transcurrido los 120 días a partir de la suspensión decretada por justa causa en 20 de junio de 1967. Por el contrario el acusado esperó hasta el día 3 de noviembre, fecha del juicio, para solicitar la desestimación de las acusaciones amparándose en su derecho a un juicio rápido, el que a nuestro juicio, consideradas todas las circunstancias concurrentes, quedó renunciado. *Pueblo* v. *Ortiz*, 51 D.P.R. 379 (1937); *Garcés* v. *Corte*, 55 D.P.R. 932 (1940); *Garcés* v. *Corte*, 55 D.P.R. 336 (1939); *Pueblo* v. *Díaz*, 60 D.P.R. 540 (1942). El segundo error no fue cometido.

En el tercer error señalado sostiene el apelante que "en ambos casos la prueba no era suficiente para destruir la presunción de inocencia del acusado."

Convenimos con el Procurador General en que la prueba en ambos casos fue suficiente para establecer la culpabilidad del apelante más allá de duda razonable. Sintetizada dicha prueba, como lo hace correctamente el Procurador General, es como sigue:

"En el caso por la violación a la Ley de Armas dos testigos declararon que vieron al acusado disparando un revólver desde el balcón de su apartamiento ʼen el Caserío Manuel A. Pérez en dirección al edificio de enfrente, donde residía la occisa Yolanda Maldonado Ramos. Así, la testigo Carmen Pilar Domenech testificó que cuando la noche de los hechos pasaba frente al Edificio D-23 del mencionado caserío, vio al acusado disparando desde el balcón de su casa en el edificio D-24 hacia la pared del edificio D-23 donde vivía la occisa Yolanda Maldonado. Además, esta testigo dijo que vio cuando la bala rebotó contra la pared porque ʼbotó candelaʼ. Véase T.E., 1ra. pieza, págs. 46–54, 103–104.

Otra testigo, de nombre Modesta Rosa Martínez, quien vivía en el primer piso del edificio D-23 frente al apartamiento del acusado, declaró que a eso de las doce de la noche del 31 de diciembre de 1966 se encontraba en el balcón de su casa y que

desde allí pudo ver que el acusado cogió un revólver y empezó a tirar tiros para el aire; que éste movía el brazo 'frente así para arriba'; y que oyó cuatro disparos. (T.E., 1ra. pieza, págs. 116–121). Dijo, además, que luego que el acusado terminó de disparar se metió el arma en el bolsillo derecho del pantalón y 'cerró su casa y se metió para adentro'. (T.E., 1ra. pieza, pág. 125.) Aunque a preguntas de la defensa dijo que no pudo distinguir bien el arma y lo que veía era explosiones y humo, aseveró que sabía que las explosiones eran de revólver porque sabía que el acusado tenía un revólver y porque 'otra cosa no iba a matar a la muchacha'. (T.E., 1ra. pieza, págs. 127–129.)

Además de estos testimonios, el fiscal presentó a la testigo Doris Esther Maldonado, hermana de la víctima, quien declaró, en síntesis, que el 31 de diciembre de 1966 se encontraba en su residencia en el edificio D-23, Apartamiento 253 del Caserío Manuel A. Pérez, con su hermana Yolanda Maldonado, su mamá Carmen Ramos y su tío Pablo Ramos, que como a las doce menos diez de la noche salieron al balcón y ella fue a buscar unas flautas al cuarto cuando oyó un disparo y a su mamá gritando; que cuando regresó del cuarto vio que Yolanda tenía mucha sangre en la cara. (T.E., 1ra. pieza, págs. 25–28) Dijo, además, que tuvo ocasión de ver al acusado en el balcón de su casa tomando cerveza, pero que no sabía quien hizo los disparos. (T.E., 1ra. pieza, págs. 30–31.)

Se ofreció, además, mediante estipulación el testimonio del Dr. Rafael Criado, médico que practicó la autopsia a la occisa Yolanda Maldonado Ramos. De acuerdo con la estipulación, que fue aceptada por el tribunal, el Dr. Criado declararía, en síntesis, que Yolanda Maldonado falleció en enero 1ro. de 1967 a la 1:10 de la madrugada; que como evidencia de trauma encontró un orificio con los caracteres de entrada de bala de 0.4 cm. de diámetro situado a nivel del entrecejo con un trayecto que sigue una dirección de afuera a adentro, de alante a atrás y oblicua de derecha a izquierda; y que la causa de la muerte fue una severa laceración cerebral por herida de bala en el cráneo. (T.E., 1ra. pieza, págs. 23–24.) (Informe Procurador General, págs. 10, 11 y 12.)

. . . . . . . .

En el caso por el delito de homicidio involuntario, además de la prueba que hemos sintetizado, el fiscal presentó el testi-

monio de Gloria Esther Opio Rosa y Hermenegildo López. La primera declaró, en síntesis, que vivía en el primer piso del edificio en que vivía Yolanda Maldonado; que esta última vivía en el tercer piso y el acusado en el segundo piso del edificio de enfrente; que la noche de los hechos vio desde el balcón de su casa al acusado con un revólver en la mano disparando y que éste cambió el brazo en distintas posiciones; que lo vio disparar tres o cuatro veces ya que sintió tres o cuatro detonaciones; que el acusado estaba de pie disparando y que el revólver era de cañón corto; que aparte de las detonaciones de los disparos no habían otras detonaciones por los alrededores y que no había gente en la calle. (T.E., 2da. pieza, págs. 73–78.) Durante la repregunta dijo que lo que vio eran disparos, y no meramente explosiones; que vio que lo que tenía el acusado era un revólver pequeño de cañón corte; que este tenía la mano hacia el frente y el revólver en su mano derecha, apuntando para el edificio D-23. (T.E., 2da. pieza, págs. 80–86.)

El otro testigo que declaró, en adición a los que declararon en el juicio por la infracción a la Ley de Armas y que repitieron su testimonio en este proceso, fue Hermenegildo López. Este dijo, en lo pertinente, que a las 12 menos 25 de la noche de los hechos entraba al apartamiento 253 donde estaba Yolanda con su mamá y su hermana; que a esa hora vio al acusado en el balcón de su residencia y que a las doce lo vio allí mismo cuando estaba tirando un tiro; que subió a la casa de la mamá de Yolanda y vio a Yolanda caer al piso herida de bala y con un chorro de sangre en la cara; que él la cogió y la llevó al hospital en su taxi; que vio al acusado con una pistola de cañón corto en la mano disparando hacia el edificio donde vivía Yolanda; que sintió dos disparos, uno antes de las doce y otro cuando subió que vio que tiró. (T.E., 2da. pieza, págs. 119–125.) En el contrainterrogatorio reafirmó que vio cuando el acusado disparó el tiro; que éste estaba disparando cuando él subió; que la pistola o el revólver era de cañón corto y de color negro; y que cuando él levantó a Yolanda del balcón vio al acusado 'cerrando la puerta y metiéndose para dentro'. (T.E., 2da. pieza, págs. 135, 141–142.)" (Informe Procurador General, págs. 12 y 13.)

Se establece pues la posesión de un revólver por el apelante y la comisión por éste con dicho revólver de un delito

de homicidio involuntario tal como lo define el Art. 203 del Código Penal (33 L.P.R.A. sec. 635), preceptivo de que dicho delito se comete al darse muerte ilegal a un ser humano sin que medie malicia cuando ocurre al realizarse un acto ilegal que no constituyere delito grave, o al realizarse un acto legal que pudiere ocasionar la muerte en forma ilegal, o sin la debida prudencia o circunspección.

Disparar voluntariamente un arma de fuego, como lo hizo el apelante, sin ser un caso de defensa propia o actuación en el desempeño de funciones oficiales, constituye un delito, menos grave. Art. 33 Ley de Armas de Puerto Rico, (25 L.P.R.A. sec. 442). Al dar el acusado muerte ilegal al ser humano Yolanda Maldonado, sin que mediara malicia cuando aquél realizó el acto ilegal de disparar voluntariamente un arma de fuego, incurrió en la comisión de un delito de homicidio involuntario.

Se señala como cuarto y último error la determinación del juez sentenciador en el sentido de que como cuestión de derecho, el acusado no podía gozar del privilegio de una sentencia suspendida por la violación del Art. 6 de la Ley de Armas.

No se cometió el error. La Ley Núm. 259 de 3 de abril de 1946, según ha sido enmendada, dispone en su Art. 2:

"El Tribunal Superior podrá suspender los efectos de la sentencia que se hubiere dictado en todo caso de delito grave que no fuere asesinato, robo, incesto, extorsión, violación, crimen contra natura, hurto, secuestro o escalamiento, y podrá asimismo, suspender los efectos de la sentencia que se hubiere dictado en todo caso de delito menos grave que surja de los mismos hechos o de la misma transacción que hubiere dado lugar, además a sentencia por delito grave que no fuere de los excluídos de los beneficios de las secs. 1026 a 1029 de este título por esta sección, incluyendo el caso en que la persona haya sido declarada no culpable en dicho delito grave o rebajado dicho delito grave a delito menos grave y así convicta, y ordenará que la persona sentenciada quede en libertad a prueba siempre que al tiempo de

imponer dicha sentencia, concurran todos los requisitos que a continuación se enumeran: . . .

. . . . . . . .

Con arreglo a lo anteriormente dispuesto, el tribunal sentenciador podrá también suspender los efectos de la sentencia de cárcel que se hubiere dictado en todo caso de homicidio involuntario que no hubiere sido ocasionado mientras se conducía un vehículo en estado de embriaguez." (34 L.P.R.A. sec. 1027, Suplemento Acumulativo, págs. 67–68.)

 Esta ley autoriza la suspensión de los efectos de la sentencia que se hubiere dictado en todo caso *de delito menos grave* que surja de los mismos hechos o de la misma transacción que hubiere dado lugar además, a sentencia *por delito grave* de los no excluidos, aun cuando la sentencia por el delito grave sea absolutoria o se haya rebajado a delito menos grave. No autoriza esta ley la suspensión de los efectos de una sentencia en un caso de delito menos grave que surja de los mismos hechos o de la misma transacción que hubiese dado lugar, además, a sentencia por otro delito menos grave, como ocurre en el caso de autos pues el homicidio involuntario, según hemos dejado establecido, es un delito menos grave. Por disposición expresa de la ley el Tribunal Superior puede suspender los efectos de una sentencia que se dicte en todo caso de homicidio involuntario que no hubiese sido ocasionado mientras se conducía un vehículo de motor en estado de embriaguez. Fue en virtud de esta disposición legal que el tribunal sentenciador suspendió los efectos de la sentencia en el caso de homicidio involuntario, mas como correctamente resolvió el Hon. Juez Gil Rivera, no procedía, como cuestión de derecho, la suspensión de los efectos de la sentencia dictada en el caso por Infracción a la Ley de Armas.(⁶)

---

(⁶) Al igual que lo hizo el juez sentenciador, el estado actual de la ley, nos impide resolver a favor del apelante su planteamiento. Creemos sin

*Por los fundamentos expuestos se confirmarán las sentencias apeladas.*

El Juez Presidente Señor Negrón Fernández, no intervino.

---

embargo, que quedarían mejor cumplidos los fines y propósitos de las leyes que autorizan la suspensión de los efectos de las sentencias, si mediante enmienda, se autoriza al Tribunal Superior a suspender los efectos de una sentencia dictada en un caso menos grave cuando éste surge de los mismos hechos o de la misma transacción que hubiese dado lugar, además, a sentencia por el delito de homicidio involuntario. Tal determinación, corresponde, desde luego, a la Asamblea Legislativa.